IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 05-07-M-DWM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| W. R. GRACE, HENRY A. ESCHENBACH, JACK W. WOLTER, WILLIAM J. McCAIG, ROBERT J. BETTACCHI, O. MARIO FAVORITO, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I. Introduction

Pending before the Court are a motion to strike the testimony of government witness Robert Locke and a motion to dismiss the Superseding Indictment due to

prosecutorial misconduct.  Locke's testimony has been suspended for one month as the parties and the Court have endeavored to reach an appropriate remedy for the dual problem posed by Locke's untrustworthy testimony and the government's late disclosure of evidence in violation of the Jencks Act, 18 U.S.C. § 3500, and in contravention of the Defendants' constitutional rights under Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972).  The facts surrounding the government's discovery failures are well known to the parties and will not be recited in detail here.  It suffices to say that the government failed in its duty to disclose witness statements and other evidence bearing on the witness' credibility in a timely manner.  The government suggested at oral argument that it referred to its "mistake, violation, error, misstep or regret" 39 times in its brief in response to the motions to dismiss.  Hrg. Tr. at 112-13, Apr. 27, 2009.

These matters have been argued extensively.  The Defendants urge the Court to impose the most drastic remedy of dismissal of the Superseding Indictment, arguing that the government's conduct, in this specific instance and in the entirety of the case, has distorted the fact-finding process of the trial beyond repair.  Although they at one point stated that they do not wish to see Locke return to the stand under any circumstances, the Defendants have since, with one exception, advised the Court that if the remedy of dismissal is not implemented they would

welcome the opportunity to continue to cross-examine Locke on the narrow issue of his relationship with the prosecution. This would include inquiry into the true number of meetings between Locke and any member of the prosecution team, the extent of Locke's animus toward Grace and Defendant Bettacchi, Locke's interactions with prosecution team members, and the details of Locke's evolution from non-target to unindicted co-conspirator to, ostensibly, unrepresented witness under threat of future prosecution.

Defendant Bettacchi differs from his co-defendants on the question of Locke's return to the witness stand. He argues that the effects of Locke's troublesome testimony are visited disproportionally upon him, and there is merit to his position. If the Superseding Indictment is not dismissed, Defendant Bettacchi has asked that Locke not be permitted to testify further.

In essence, the prosecution's argument is that the virtue of its case sanctifies the means chosen to achieve conviction. This argument cannot prevail in a legal system that is designed to ensure fairness in the proceeding when each side follows the rules. Our confidence in the fairness of our system is rooted in the belief that our process is sound. Useful falsehoods are particularly dangerous in a criminal case, where the cost of wrongful conviction cannot be measured in the impact on the accused alone. Such tainted proof inevitably undermines the process, casting a

dark shadow not only on the concept of fairness, but also on the purpose of the exercise of the coercive power of the state over the individual. No man should go free nor lose his liberty on the strength of false, misleading or incomplete proof.

In one sense the pending motions present distinct legal issues: the reliability of Locke's testimony on one hand, and the government's discovery and constitutional violations on the other. As the arguments on these issues have demonstrated, however, they are intertwined to the point that the discussion of one will eventually require consideration of both. While the motions are discussed separately below, they are addressed collectively in the implementation of the remedy.

## II.  Robert Locke

Much of Robert Locke's testimony in this case is incredible. He gave an incomplete account of his many meetings with the prosecution, likely creating a misimpression in the minds of the jury that the government did not attempt to correct. He testified to his ignorance as to the identity of Grace's lead corporate counsel, when his own records reveal that he knows exactly who Grace's top lawyer is, and had met with him personally. In response to carefully crafted questioning from government counsel, Locke gave an account of the purposes and motivations behind his "options" memo (Gov. Ex. 239) that was so selective as to

border on prevarication. Locke's account of his rejection of the government's grant of immunity (Def. Ex. 16076) was similarly incomplete, and the government did nothing to correct the record. Finally, Locke's recollection of Defendant Bettacchi's dismissive invocation of "caveat emptor" in response to Locke's reservations over the sale of the screening plant property is highly suspicious; the record does not permit us to know for certain whether Locke presented a convenient remembrance, a crafty embellishment, or an outright lie.

Other behavior and testimony from Locke casts doubt on his credibility. Throughout his testimony, he gave non-responsive answers in which he volunteered information that was prejudicial to the Defendants. He admitted that he had been following the trial proceedings in news accounts and through other media because the trial was important to him. Documents offered by the Defendants, as well as documents produced in response to the Rule 17(c) subpoena issued to Locke, suggest that he has more than once sought to leverage his status as cooperating witness with plaintiffs' attorneys and with the United States in this case to achieve a favorable outcome in his civil suit against Defendants Grace and Bettacchi. He destroyed, on the eve of trial, his personal calendars from recent years, including those that might have revealed meetings relative to his civil suit. He took records and documents from W.R. Grace headquarters that he was not

authorized to keep and has sought to parlay them into leverage by cooperating with plaintiffs' counsel in civil cases.

### III.  The Government's Discovery and Brady Violations

The government has committed clear and admitted violations of Fed. R. Crim. P. 16, 18 U.S.C. § 3500, and <u>Brady</u> and <u>Giglio</u>.  While the prosecution initially resisted any such characterization of its non-disclosure as a violation of any obligation, counsel for the government now concede their error and profess to take full responsibility for it.  Locke's e-mail exchanges with Special Agent Marsden, his immunity negotiations with the government, and Marsden's notes as to those negotiations and other matters show Locke's animus toward the Defendants and the extent of his relationship with the prosecution.  They are evidence of the bias of the prosecution's star witness, which is clearly a fertile area for cross-examination.  The documents should have been disclosed, and the government's failure to timely disclose denied the Defendants the opportunity to conduct thorough and more effective cross-examination.

Since first coming clean with Locke's e-mails but denying their constitutional import, the government has ratcheted up its contrition in increments, apparently hoping to pinpoint the minimum degree of repentance necessary to satisfy the Court.  The explanation offered for the non-disclosure is that the

government's discovery obligation is simply too vast to expect complete compliance – as AUSA Cavan put it, the prosecution has "a thousand balls in air." Hrg. Tr. at 244, Apr. 17, 2009. AUSA Racicot stated, "[W]e just dropped the ball. It wasn't that we were trying to hide it." Hrg. Tr. at 124, Apr. 27, 2009. Implicit in this line of argument is the complaint that the Court has overburdened the government by issuing excessively broad discovery orders.

The size of the case, and the resulting disclosure obligation, is a condition of the government's choosing. The constitution and the law do not yield when the government casts a wide net in the charging decision. The government resists the Defendants' effort to tie the most recent discovery violation to the government's earlier transgressions in this area, but the Court is not entirely willing to view the most recent episode in isolation. The government's own argument blaming the scope of its disclosure duties conjures up the failures of the past. The history of this case suggests that the failure to disclose documents related to Locke is merely the latest manifestation of a systemic problem, i.e., that the Department of Justice charged a case larger than the one it prepared to prosecute.

The record reveals that Special Agent Marsden had a completely flawed understanding of the government's disclosure obligations under Brady and Giglio. He filed an affidavit saying that he asked AUSA McLean whether the Locke notes

and e-mails should be produced, and McLean answered in the negative.  AUSA Cassidy's affidavit said Special Agent Marsden's misconceptions as to the government's constitutional responsibilities did not come from Cassidy, who instructed case agents properly.  Cassidy also stated that Special Agent Marsden had left him with the impression that Locke's communication with Marsden consisted mainly of press articles.  AUSA McLean stated that he failed to review Marsden's e-mails because Marsden told McLean the emails were "just press clippings."  McLean also states that Marsden's testimony regarding Brady and Giglio was not based on McLean's instruction to Marsden.

The attempt by the United States to rationalize its failure to disclose suggests that the prosecution is not up to the task of meeting its discovery obligations in the case it charged.  The government's own attorneys argue that the demands of this sprawling case are so daunting that the Court must permit the occasional non-malicious violation of the Defendants' constitutional rights.  In the words of AUSA Cavan, "there is no such thing as a perfect case."  Hrg. Tr. at 244, Apr. 17, 2009.  The record shows that the government's case agent had an improper understanding of the law.  To the extent that the prosecutors have filed affidavits saying they are not responsible for implanting Marsden with that improper understanding, it is of no consequence.  It makes no difference whether the agent came to his

misunderstanding through faulty instruction or lack of sufficient instruction; either way, the prosecutors are responsible.  Marsden's misunderstanding led him to ignore the importance of Locke's emails, which in turn led prosecutors to fail to review them, resulting in prejudice to the Defendants.

These themes of poor planning and incompetence are common threads throughout the government's spotty compliance with its disclosure obligations dating back to the beginning of the case.  However, incompetence is not bad faith.  Poor planning is not malice.  A systemic flaw is not always flagrant conduct.  And the damage, while serious, is not irreparable.  The behavior of the prosecution is troubling and at times frustrating, but the record does not support a finding of prosecutorial misconduct.[1]  What is clear from the record is that the government's conduct creates a climate in which the Defendants' constitutional rights are at risk, and the Court's role of ensuring the fair administration of justice is complicated.

---

[1] The Court and the parties have given extensive consideration to the Ninth Circuit opinion in United States v. Chapman, 524 F.3d 1073 (9th Cir. 2008), in which the court of appeals upheld the district court's dismissal of the indictment after declaring a mistrial due to Brady and Giglio violations.  Based on the record in this case, Chapman puts this Court well within its discretion to declare a mistrial and dismiss the Superseding Indictment.  There are, however, two critical distinctions between this case and the facts in Chapman.  The witnesses at issue in Chapman had left the stand, and could not practically be recalled.  Id. at 1079-80.  Here the government revealed its breach during the cross-examination of Locke and he remains under subpoena.  Unlike the situation in Chapman, continued cross-examination of the relevant witness is a viable remedy.

A more important distinction is the fact that the district court in Chapman found that the government had acted "flagrantly, willfully, and in bad faith."  Id. at 1080 n.2.  The Court has not made a similar finding in this case.  The extreme remedy in Chapman is not warranted here.

### IV.  Remedy

The parties have put before the Court a range of remedial options.  The most drastic is to dismiss the Superseding Indictment, either with or without prejudice.  As discussed above, dismissal on the basis of prosecutorial misconduct is not warranted here.

The next option is for the Court to declare a mistrial.  The Defendants have shown no interest in a mistrial, as it would allow the government the opportunity to start anew and, in essence, benefit from its failure to fulfill its disclosure obligations by receiving the proverbial second bite at the apple.  The Defendants have represented that but for the matters at issue here, they do not wish to forfeit their position except due to dismissal of the charges.  It is the Court's understanding that the government also opposes the remedy of a mistrial.

The third possibility is to strike Locke's testimony in its entirety as a remedy for the government's Jencks Act and Brady/Giglio violations.  This option has some appeal in light of the prejudice occasioned by the government's non-disclosure and the unreliable nature of Locke's testimony.  In the end, however, striking Locke's testimony in its entirety goes too far.

The unavoidable conclusion from listening to Locke's testimony is that he is untrustworthy, and his testimony is very likely fabricated in important respects.

This is a judgment reached through the application of common sense; the witness is simply not credible. But while there is ample evidence of his untrustworthiness, and a strong circumstantial case for perjury, there is no irrefutable objective proof that he has perjured himself. In my view the circumstantial evidence is sufficient, but absent an unmistakable case for perjury, it is not the Court's view on credibility that matters. The issue of Locke's trustworthiness is ultimately for the jury to decide. Intrusion into the jury's consideration of the factual record should occur only as minimally necessary to correct a failure of the process to ensure fairness.

The minimally intrusive solution here is to allow Locke's testimony to stand, subject to the following conditions intended to cure the prejudice to the Defendants resulting from the government's failure to disclose. First, the Defendants may continue cross-examination of Locke on the narrow issues of his relationship and meetings with the government, his animus toward the Defendants, and his status in relation to immunity. Continued cross-examination within these confines will allow the Defendants to utilize the recently disclosed information to conduct a fully informed albeit belated cross-examination to complete the factual record before the jury.

Continued cross-examination is not favored by all Defendants. Defendant Bettacchi, having been uniquely prejudiced by Locke's testimony and the

government's conduct, would understandably prefer that Locke not return to the stand. This conflict among the Defendants appears on the surface to foreclose the remedy of continued cross-examination, but it is not so. There is a cure that both solves the conflict and recognizes that the government's withholding of evidence showing the true extent of Locke's bias and partnership with the prosecution has had heightened consequences for Defendant Bettacchi. Counsel for Defendant Bettacchi was denied an opportunity to fully cross-examine on the number of meetings between Locke and the government, resulting in a less compelling presentation. Had he been fully informed of the genesis of Locke's recollection, Bettacchi's counsel also would likely not have potentially compromised himself as he did by drawing legitimate inferences of recent fabrication relating to Locke's "caveat emptor" testimony. Bettacchi's counsel may well have opened differently had he been fully aware of Locke's attitude toward his client.

The substance of Locke's testimony is especially prejudicial to Bettacchi, as he is the subject of Locke's dubious recollections of discussions on the sale of the former screening plant. Moreover, Locke's e-mails exchanges with Special Agent Marsden make clear that Bettacchi held special status among the targets of Locke's vengeance. The evidence of bias against Bettacchi is far deeper than that against any other Defendant, the significance of which is twofold: first, Bettacchi has

suffered greater prejudice from non-disclosure; and second, Locke's already questionable testimony is even more suspect on matters concerning Bettacchi personally.  It is difficult to believe that the Justice Department would sponsor such a biased witness as the linchpin of its conspiracy case.  For all of these reasons, the continued cross-examination of Locke will be accompanied by an instruction to the jury that it may not rely upon the testimony of Robert Locke in deciding Defendant Bettacchi's guilt or innocence on any charge.

The jury will be further instructed that the government has failed to fully disclose information to the defense as required by the rules and the Constitution, and that Locke is back on the stand so examination can continue after the Defendants have received the information they are entitled to.  The jury will be instructed that the striking of Locke's testimony as to Bettacchi should not be read as an endorsement of Locke's testimony as to other Defendants; to the contrary, the jury should view Locke's entire testimony with skepticism.

As part of the remedy, the United States will not be permitted to conduct a redirect examination.  The process, when adhered to by all parties, is designed to ensure fairness.  When a party fails to fulfill its responsibilities under the process for any reason, it falls to the Court to restore the fairness that the constitution and basic notions of justice require.  Here that is achieved by prohibiting re-direct

examination. Locke's testimony will remain in the record, but it will not be bolstered on re-direct examination.

Based on the foregoing, IT IS HEREBY ORDERED that the motion to strike the testimony of Robert Locke (Doc. No. 1021), and the motions to dismiss the Superseding Indictment due to prosecutorial misconduct (Doc. Nos. 1113 and 1117) are GRANTED in part and DENIED in part as set forth above.

Dated this 28th day of April, 2009.

_____
DONALD W. MOLLOY, Chief Judge
United States District Court